UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MELISSA L. BAYNE,<br>   Plaintiff,<br> v.<br>BOWLES HALL FOUNDATION, et al.,<br>   Defendants. | Case No. 21-cv-01959-JCS<br><br>**ORDER GRANTING MOTION TO DISMISS THE REGENTS OF THE UNIVERSITY OF CALIFORNIA FROM PLAINTIFF'S SECOND AMENDED COMPLAINT PURSUANT TO RULE 12(B)(6)**<br><br>Re: Dkt. No. 38 |

## I. INTRODUCTION

Plaintiff Melissa Bayne brings this gender discrimination and retaliation case against the Regents of the University of California ("Regents") and the Bowles Hall Foundation ("the Foundation") based on the failure of the Foundation to renew her employment contract as dean of Bowles Hall Residential College. On August 5, 2021, the Court dismissed Plaintiff's claims against the Regents with leave to amend, finding that she did not adequately allege that the Regents were a joint employer as to her position or that the Regents knew or should have known about the Foundation's conduct but failed to undertake prompt corrective measures. Dkt. 34 ("August 5 Order") at 29. Plaintiff filed a second amended complaint ("SAC") in which she attempted to cure these defects and the Regents have now brought a motion to dismiss the SAC ("Motion"), arguing that it again fails to state any claim against the Regents. The Court finds that the Motion is suitable for determination without oral argument and therefore **vacates the motion hearing set for November 19, 2021 at 9:30 a.m. pursuant to Civil Local Rule 7-1(b). The Case Management Conference scheduled for the same date will be conducted at 2:00 p.m. on November 19, 2021 rather than at 9:30 a.m**. For the reasons set forth below, the Court GRANTS the Regents' Motion and dismisses Plaintiff's claims against the Regents with

prejudice.[1]

## II. BACKGROUND

The underlying factual allegations in the SAC are substantially the same as those in the First Amended Complaint, which were described at length in the Court's August 5 Order, and therefore the Court does not summarize them here. Likewise, the claims asserted against the Regents in the SAC are the same. However, Plaintiff has added a section to the complaint addressing joint employer liability in which she alleges as follows:

> **III. JOINT EMPLOYER [LIABILITY] OF THE REGENTS FOR BOWLES HALL'S ACTIONS TOWARD PLAINTIFF**
>
> 35. The Regents exercise a great deal of control over the Foundation, rendering the Regents jointly liable for the Foundation's retaliatory actions toward Dr. Bayne. Furthermore, the Regents knew or should have known about the Foundation's retaliation against Dr. Bayne.
>
> **A. The Regents Effectively Control the Foundation's Operations**
>
> 36. The Foundation leases the Bowles Hall building from the Regents. The lease spans a 40-year time period.
>
> 37. According to the lease, the Foundation and the Regents must comply with a "Cooperation Agreement." According to a "Cooperation Agreement" between the Foundation and the Regents, the Foundation "acknowledges and agrees that [the Regents] maintain[] campuswide policies and procedures for the Berkeley Campus as listed on the Campus website or as otherwise provided to the [Foundation] and occasionally adopts non-discriminatory amendments to such rules, regulations and policies for the Berkeley Campus from time to time (such rules regulations and policies, as so amended from time to time, the 'Campus Rules')." (emphasis in original). According to this agreement, the Foundation "shall manage and operate [Bowles Hall] in compliance with Campus Rules . . . ." According to the Berkeley Campus website, Campus Rules "may be issued by the Board of Regents, the Office of the President, or the campus."
>
> 38. Campus Rules found on the campus website consist of 472 different policies issued by the Office of the President alone. These policies cover a wide-ranging list of topics, many of which relate to the Foundation's operations, including polices requiring the Foundation to "report[] to designated campus units . . . [any] sensitive or criminal activity", forbidding discrimination and retaliation in employment, requiring that all forms provided to students or staff contain at least three options for gender identity,

---

[1] The parties have consented to the jurisdiction of a United States magistrate judge pursuant to 28 U.S.C. § 636(c).

establishing a reporting and investigation procedure for gender-based and race-based harassment, establishing a reporting and investigation procedure for allegations of sexual violence, detailing electronic information security protocols, providing specifications for renovations of facilities, and a multitude of other topics.

39. In 2018, the Regents conducted an audit of the Bowles Hall. According to the results of the audit, the "Campus Rules" that the Foundation must follow are so complex that the Foundation's full compliance with all of these Campus Rules imposed by the Regents is unlikely. The auditor recommended that, in order to achieve the Regents' goals for Bowles Hall, by October 1, 2019, the Regents should implement a system whereby the Regents "identify, prioritize, and communicate to Bowles Hall Foundation those key rules and requirements that it should be aware of in its operation of Bowles Hall and the residential college program." The auditor warned that otherwise, it is likely that the plethora of rules and regulations will prevent the "college dean or other responsible parties at [Bowles Hall]" from complying with those rules that the Regents actually finds important such as "reporting . . . sensitive or criminal activity" to representatives of the Regents.

40. Moreover, the Regents are free to impose new rules and obligations on the Foundation with no input from the Foundation. In fact, according to a 2018 audit of the Foundation performed by the Regents, the auditor recommended that by October 1, 2019, the Foundation be obligated to complete "an annual certification process by which the college dean or other designated representatives of the Foundation, certify compliance with the articulated rules and requirements." As noted, these rules and requirements can cover virtually any subject and can be unilaterally imposed on the Foundation by the Regents. The auditor suggested that "[c]ampus training and informational resources could be made available to Bowles Hall staff to help them understand and adhere to the [Regent's] requirements." The auditor further observed that "Bowles Hall does not have a formal emergency operational plan or a business continuity plan similar in rigor and detail to those required by campus units . . . ." The auditor recommended that, by October 1, 2019, that the "Foundation develop a specific emergency plan that will be submitted to the [Regents] for review." The auditor stated that the Regents can compel the Foundation to create such a plan "under the compliance with 'campus rules' requirement of the [Cooperation Agreement]."

41. As such, the Regents had the authority to and did control the Foundation's operations, including the day to day responsibilities of its staff, by issuing "Campus Rules," which the Foundation is contractually obligated to follow.

42. In June of 2018, after Dr. Bayne complained about Dr. Varnich's improper behavior, the Regents' general counsel instructed the Foundation to not "proceed with further investigation [or] action [against Dr. Vranich] until [the Regents] complete[] [their] investigation." The Foundation complied with the Regents' directive. As such, the Regents exercise control over termination and discipline of Foundation employees.

43. The Regents also exercise control over the Foundation through its appointment of members of the Foundation's Board of Directors. Under the Cooperation Agreement between the and the Foundation, the Regents "shall have the right to appoint three (3) members of the board of [the Foundation]." "Two of [these] Directors shall be members

3

of the Campus faculty and one of the . . . Directors shall be a senior administrator on the Campus." According recommendations resulting from a 2018 audit of the Foundation by the Regents, the Regents could "strengthen [their] oversight of the Bowles Hall arrangement by creating an official charge from the [Regents] to its three representatives serving on the Foundations board as to their fiduciary duty on behalf of the [Regents]." The auditor recommended that by October 1, 2019, the Regents "will work with Bowles Hall Foundation to establish official charge letters with terms of service for all UC Berkeley faculty and staff that Serve on the Bowles Hall Foundation Board of Directors." Moreover, the Regents "will also implement an 'annual report' requirement which will enable campus administration to be briefed on the programmatic, operational, financial and compliance status of the residential college elements of Bowles Hall."

44. In sum, the Regents exercise control over the operations of the Foundation through representation on the Foundation's board of directors, as well as through rules and policies promulgated by the Regents that the Regents may unilaterally impose on the Foundation and that may dictate virtually any aspect of the Foundation's operations.

**B. The Regents Knew or Should Have Known About The Foundation's Retaliation Against Dr. Bayne**

45. The Board of Directors that decided to not renew Dr. Bayne's contract contained two senior administration officials: Robert Jacobsen, Dean of Undergraduate Studies at the College of Letters and Science and Stephen Sutton, vice chancellor of the Student Affairs Division. These board members were required to report the retaliation against Dr. Bayne to the Berkeley Campus Title IX office.

SAC ¶¶ 35-45.

In the Motion, the Regents argue that Plaintiff still does not properly allege any adverse employment action on the part of the Regents or a joint employer relationship with the Foundation. Motion at 6-10. The Regents argue further that even if the allegations in the SAC were sufficient to show a joint employer relationship, they do not establish that the Regents can be held liable for the Foundation's conduct because the SAC does not allege specific facts showing that the Regents knew or should have known about Plaintiff's termination but failed to undertake prompt corrective measures. *Id.* at 10-11. Finally, the Regents argue that the claims against them should be dismissed with prejudice and without leave to amend because Plaintiff has already been given an opportunity to address these shortcomings and has been unable to establish a basis for liability as to the Regents. *Id.* at 11-12. Therefore, they assert, amendment is futile. *Id.*

In her Opposition, Plaintiff argues that the allegations in the SAC establish that the Regents effectively control the operations of Bowles Hall and its employees. Opposition at 7-10.

In particular, she points to the allegations that the 40-year lease between the Regents and the Foundation requires that the Foundation comply with a Cooperation Agreement and that the Cooperation Agreement, in turn, requires the Foundation to follow Campus Rules and gives the Regents the right to appoint three members of the Foundation's Board of Directors. *Id.* Plaintiff also points to her allegations about a 2018 audit of Bowles Hall by the Regents in which the auditor concluded the Campus Rules were too complex and therefore difficult to comply with and recommended the Regents "identify, prioritize, and communicate to Bowles Hall Foundation those key rules and requirements that it should be aware of in its operation of Bowles Hall and the residential college program." *Id*. at 8 (quoting SAC ¶ 39). In support of her assertion that the Regents have control over discipline and termination of the Foundation employees, Plaintiff points to her allegation that the Regents' counsel instructed the Foundation not to "proceed with further investigation [or] action [against Dr. Vranich] until [the Regents] complete[] [their] investigation." *Id.* at 9 (citing SAC ¶ 42).

In support of her assertion that the Regents can be held liable for her termination, Plaintiff points to her allegation that two Foundation Board members who were appointed by the Regents were senior administration officials and were required to report the retaliation against Dr. Bayne to the Berkeley Campus Title IX office. *Id.* at 10 (citing SAC ¶ 45).

Plaintiff asks that she be permitted to amend the complaint if the Court finds that her allegations regarding joint liability are not sufficient. *Id.* at 22.

## III. ANALYSIS

### A. Legal Standards Under Rule 12(b)(6)

A complaint may be dismissed under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim on which relief can be granted. "The purpose of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of the complaint." *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983). Generally, a plaintiff's burden at the pleading stage is relatively light. Rule 8(a) of the Federal Rules of Civil Procedure states that a "pleading which sets forth a claim for relief . . . shall contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a).

5

In ruling on a motion to dismiss under Rule 12(b)(6), the court analyzes the complaint and takes "all allegations of material fact as true and construe[s] them in the light most favorable to the non-moving party." *Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). Dismissal may be based on a lack of a cognizable legal theory or on the absence of facts that would support a valid theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). A complaint must "contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 562 (2007) (citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). "[C]ourts 'are not bound to accept as true a legal conclusion couched as a factual allegation.' " *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557) (alteration in original). Rather, the claim must be " 'plausible on its face,' " meaning that the plaintiff must plead sufficient factual allegations to "allow [] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 570).

### B. Legal Standards Governing Joint Employer Liability

Under Title VII, a plaintiff may have more than one "employer" for purposes of liability. *U.S.E.E.O.C. v. Global Horizons, Inc.*, 915 F.3d 631, 637 (9th Cir. 2019) ("The law recognizes that two entities may simultaneously share control over the terms and conditions of employment, such that both should be liable for discrimination relating to those terms and conditions."). In *Global Horizons*, the Ninth Circuit concluded that the common-law agency test governs the determination of whether an entity is a joint employer in the Title VII context. *Id.* at 638. "Under the common-law test, 'the principal guidepost' is the element of control—that is, 'the extent of control that one may exercise over the details of the work of the other.' " *Id.* (quoting *Clackamas Gastroenterology Assocs., P. C. v. Wells*, 538 U.S. 440, 448 (2003) (internal quotation marks

omitted)). The Supreme Court has provided a non-exhaustive list of factors to consider when analyzing whether the requisite control exists:

> the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*National Mutual Ins. Co. v. Darden*, 503 U.S.318, 323–24 (2003) (internal quotation marks omitted). This test also applies in the context of Title IX. *See Emeldi v. Univ. of Oregon*, 673 F.3d 1218, 1223 (9th Cir. 2012) (holding that Title VII framework governs Title IX retaliation claims).

California courts that have considered the meaning of "joint employer" under FEHA have relied heavily on federal court decisions interpreting Title VII. *Hall v. Apartment Inv. & Mgmt. Co.*, No. C 08-03447 CW, 2011 WL 940185, at *5 (N.D. Cal. Feb. 18, 2011) (citing *Vernon v. State*, 116 Cal. App. 4th 114, 123, (2004)). In *Vernon*, the court observed that "[t]he common and prevailing principle espoused in all of the tests directs us to consider the 'totality of circumstances' that reflect upon the nature of the work relationship of the parties, with emphasis upon the extent to which the defendant controls the plaintiff's performance of employment duties." 116 Cal. App. 4th at 124 (citations omitted). It listed the following factors that courts consider in determining whether an entity is a joint employer:

> Factors to be taken into account in assessing the relationship of the parties include payment of salary or other employment benefits and Social Security taxes, the ownership of the equipment necessary to performance of the job, the location where the work is performed, the obligation of the defendant to train the employee, the authority of the defendant to hire, transfer, promote, discipline or discharge the employee, the authority to establish work schedules and assignments, the defendant's discretion to determine the amount of compensation earned by the employee, the skill required of the work performed and the extent to which it is done under the direction of a supervisor, whether the work is part of the defendant's regular business operations, the skill required in the particular occupation, the duration of the relationship of the parties, and the duration of the plaintiff's

employment.

*Id.* at 125 (citations omitted).

"[E]ven if a joint-employment relationship exists, one joint employer is not automatically liable for the actions of the other." *Global Horizons*, 915 F.3d at 641. Rather, liability may only be imposed if the defendant employer knew or should have known about the other employer's conduct and failed to undertake prompt corrective measures. *Id.*

**C.     Discussion**

Like the First Amended Complaint, the SAC does not allege any direct involvement by the Regents in hiring Plaintiff, evaluating her performance or terminating her. To the contrary, the SAC alleges it was the Foundation that did these things. *See* SAC ¶¶ 10 ("Dr. Bayne was hired by the Foundation in or around August 2016"), 15 ("the Bowles Hall Foundation Board of Directors . . . invited Dr. Bayne to discuss complaints regarding her performance as Dean of Students"), 20 (during "a conference call with the executive committee of the [Board of Directors] . . . President John Baker chastised Dr. Bayne for reporting these incidents regarding Dr. Vranich to UC Berkeley"), 31 (at a meeting of the BOD that Plaintiff "was asked to attend[ ] [s]he was informed that Bowles Hall would not renew her contract for the 2019/2020 school year."). Thus, the Regents can only be liable on a joint employer theory. Considering the totality of the circumstances as alleged in the SAC, however, the Court finds that Plaintiff has not alleged facts that raise a plausible inference that the Regents and the Foundation were Plaintiff's joint employer. Therefore, the Court concludes Plaintiff's claims against the Regents fail to state a claim.

The SAC alleges that the Foundation leases Bowles Hall from the Regents, SAC ¶ 36, arguably pointing in favor of a joint employer relationship under the *Vernon* factor that looks to the location where the work is performed (on campus). *See* 116 Cal. App. 4th at 125. The allegation that the lease between the Regents and the Foundation has a 40-year term, *see id.*, is another factor that supports such a finding. None of the remaining *Vernon* factors supports a finding that the Regents were in a joint employer relationship as to Plaintiff's employment with Bowles Hall, however. The SAC does not allege that the Regents had any role in paying

Plaintiff's salary, benefits, or Social Security taxes in connection with her job as dean or determining the salary she would be paid. Nor does the SAC contain any allegations suggesting the Regents provided "equipment" necessary for her to perform her position, supervised her work or determined her assignments.

Plaintiff attempts to show that the Regents had authority with respect to hiring, disciplining and termination based on the Foundation's obligations under the Cooperation Agreement but those allegations fall short. First, to the extent the Cooperation Agreement is alleged to require the Foundation to adhere to the Campus Rules, Plaintiff's allegations as the nature of those rules do not raise a plausible inference that the Regents exercised control over the conditions of Plaintiff's employment. Rather, the description of the Campus Rules in the SAC indicates that while they cover a "wide-ranging list of topics" they impose only general obligations that do not specifically relate to Plaintiff's employment as dean of Bowles Hall. *See* SAC ¶ 38 (alleging Campus Rules cover policies "requiring the Foundation to 'report[] to designated campus units . . . [any] sensitive or criminal activity', forbidding discrimination and retaliation in employment, requiring that all forms provided to students or staff contain at least three options for gender identity, establishing a reporting and investigation procedure for gender-based and race-based harassment, establishing a reporting and investigation procedure for allegations of sexual violence, detailing electronic information security protocols, providing specifications for renovations of facilities, and a multitude of other topics").

Likewise, allegations about recommendations that came out of a 2018 audit of Bowles Hall by the Regents do not specifically relate to Plaintiff's position. *See* SAC ¶¶ 39 ("The auditor recommended that, in order to achieve the Regents' goals for Bowles Hall, by October 1, 2019, the Regents should implement a system whereby the Regents 'identify, prioritize, and communicate to Bowles Hall Foundation those key rules and requirements that it should be aware of in its operation of Bowles Hall and the residential college program.' "), 40 ("the auditor recommended that by October 1, 2019, the Foundation be obligated to complete 'an annual certification process by which the college dean or other designated representatives of the Foundation, certify compliance with the articulated rules and requirements.' "). Furthermore, there is no allegation

1  that these recommendations were implemented.

2  Moreover, even to the extent the Campus Rules give the Regents control over some aspects of the "Foundation's operations[,]" *see* SAC 41, Plaintiff has not alleged facts linking that control to any specific aspect of *Plaintiff*'s performance of her job as dean of Bowles Hall. Nor has she cited any authority suggesting that this type of general authority of one entity over another is evidence of a joint employment relationship as to a specific employee. Finally, even if the Regents have the authority to change the Campus Rules without consulting Bowles Hall, as Plaintiff alleges, *see* SAC ¶ 40, the possibility that the Regents might in the future adopt rules that directly relate to Plaintiff's job at Bowles Hall is simply too speculative to support a finding that the Regents are Plaintiff's joint employer.

The Court also finds unpersuasive Plaintiff's reliance on allegations that the Regents are authorized under the Cooperation Agreement to appoint three members of the Foundation's Board. *See* SAC ¶ 43. There is no allegation that these three members constituted a majority such that they controlled the Board; nor does the SAC allege any specific facts showing that board members who were appointed by the Regents (only two are specifically listed), *see* SAC ¶ 45, exercised any control over Plaintiff in her position as dean.

Plaintiff's reliance on the allegation that the Regents asked the Foundation not to proceed with its investigation of Dr. Vranich until they had finished their own investigation, *see* SAC ¶ 42, is also misplaced. Assuming that actions taken in connection with Dr. Vranich can support an inference as to the Regent's control over Plaintiff's termination and discipline (an inference that the Court finds to be reasonable given that the two held the same position at Bowles Hall), the allegation supports at most a very weak inference of control as it relates only to the timing of the Foundation's investigation and termination and not the Foundation's findings or determination of what discipline would be taken in light of those findings.

In sum, considering the totality of the circumstances, the Court finds that Plaintiff has failed to allege facts sufficient to raise a plausible inference that the Regents were her joint employer under either federal or California law. Consequently, all of the claims she asserts against the Regents fail to state a claim under Rule 12(b)(6). Further, although Plaintiff asks for another

opportunity to amend the complaint to allege further facts in support of the Regents' joint employer status, she has not pointed to any additional facts she could allege to cure the defects identified above.  As the Court has already given Plaintiff an opportunity to amend and she has not been able to allege facts sufficient to raise a plausible inference of joint employer liability, it concludes that amendment is futile.  *See Thinket Ink Info. Res., Inc. v. Sun Microsystems, Inc.*, 368 F.3d 1053, 1061 (9th Cir. 2004) (holding that a district court does not err in denying leave to amend where amendment would be futile) (citing *Saul v. United States*, 928 F.2d 829, 843 (9th Cir. 1991)).

## IV. CONCLUSION

The Motion is GRANTED.  Plaintiff's claims against the Regents (Claims One, Two, Three, Four and Seven) are dismissed with prejudice as to the Regents only.  The Regents are dismissed from this case.

**IT IS SO ORDERED.**

Dated:  November 9, 2021

_____
JOSEPH C. SPERO
Chief Magistrate Judge